**Cleoria Leroy WATTS, Jr., Plaintiff,**

v.

**Captain Kenneth MORGAN, individually and as Shift Commander, Stateville Correctional Center, et al., Defendants.**

No. 82 C 0274.

United States District Court,
N.D. Illinois, E.D.

Aug. 30, 1983.

Robert L. Graham, Frances L. Pergericht, Jenner & Block, Chicago, Ill., for plaintiff.

Stephen G. Kehoe, Asst. Atty. Gen., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

WILLIAM T. HART, District Judge.

The plaintiff, Cleoria L. Watts, Jr. ("Watts") is an inmate at Stateville Correctional Center ("Stateville") in Joliet, Illinois and the defendants are various prison officials employed by the Illinois Department of Corrections ("IDOC") at Stateville.[1] Watts brings this action under 42 U.S.C. § 1983 claiming that his right to due process was denied because he was removed from a job assignment at Stateville without prior notice or a hearing, allegedly in violation of state statute and regulation. As a result, Watts asserts that he was unconstitutionally deprived of work for 23 days, lost the opportunity to earn meritorious good time during that period, eventually was permanently removed from one job assignment and was denied prescribed eye medication. Subject matter jurisdiction is asserted under 28 U.S.C. §§ 1331 and 1343.

Presently before the Court is defendants' motion to dismiss the amended complaint for failure to state a claim upon which relief may be granted, Fed.R.Civ.P. 12(b)(6), or for summary judgment, Fed.R.Civ.P. 56. The motions are made based on three general contentions: First, Watts has no liberty or property interest in retaining a prison job assignment. Second, even if he had such an interest, Watts cannot legally establish that his claim of improper removal was inadequately considered by the prison grievance committee. Finally, Watts fails to assert any denial of medical care compensable under section 1983 because the only defendant charged with the alleged mistreatment, the Assistant Warden of Programs, is not alleged to have committed any direct acts.

For the reasons that follow, the motion to dismiss for failure to state any claim is granted.

## FACTS

Beginning in August 1981, Watts was assigned as a stretcher runner at Stateville's Screening Clinic ("Clinic"). The Clinic is a medical dispensary. He remained in that position until January 4, 1982 when his assignment was temporarily cancelled due to a rumor that he was fraternizing with a female, noninmate employee of the Clinic. Watts was placed on "unassigned status pending investigation." He claims that he neither received any explanation at the time of his removal nor was he afforded a hearing to contest the removal. Watts, however, says that on January 11, 1982 he filed a grievance protesting the removal with Stateville's Institutional Inquiry Grievance Board and received no response until three months later.

In the interim, the defendants found no legitimate basis to support the rumors of Watts' alleged fraternization. On January 27, 1982, 23 days after he was removed, Watts was reassigned to the Clinic. On April 19, 1982, he was once again removed from the Clinic—permanently. The stated reason was a new rule which requires the inmate staff of the Clinic to be rotated every six months.[2] Watts was transferred to the butcher shop. He argues that the new rule is not the reason for his permanent transfer from the Clinic. Rather, he

---

1. The defendants are: Captain Kenneth Morgan, Shift Commander; Salvador Godinez, Assistant Warden for Program Services; Officer E. Lawler, Correctional Officer; Lt. Peter King, Correctional Officer; Lt. Jessie Jamerson, Correctional Officer; Lt. Gabriel Rodriguez, Correctional Officer; Officer Cecil Buckner, Correctional Officer; Michael Huff, Correctional Casework Supervisor; Captain Billy Johnson, Correctional Officer; Mel Allen, Chairman of the Institutional Inquiry Board; and Officer William Banks, Correctional Officer. Each is sued individually and in his official capacity.

2. There is no question that prison officials may promulgate such a rule. There is some discrepancy as to when this rule was passed. However, it is clear that the rule was in place on or about February 1, 1982.

says that his permanent transfer was prompted by the same, untrue allegations of fraternization which led to his temporary removal pending investigation.

Watts also claims that he suffers from an unidentified eye disease which requires medical treatment twice daily. He says that during the 23 day period in which he remained idle, he did not receive or received irregularly his treatment at the Clinic. Watts claims that as a result he suffered much pain.

Watts asserts a property interest in prison employment which cannot be disturbed absent due process. He also argues, in effect, that his alleged deprivation of good time impaired his liberty interest in a speedy release from incarceration.

### DISCUSSION

#### A. Liberty or Property Interest

The Fourteenth Amendment prohibits a state from depriving all persons, including incarcerees, of life, liberty or property without due process. *Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 336 (1974). But, every interference by the state which results in some discomfort or deprivation is not actionable. Only where a claimant can satisfy both parts of a two part test may he recover for an unconstitutional deprivation. *Shango v. Jurich,* 681 F.2d 1091 (7th Cir.1982).

First, the Court must establish whether a protected interest exists. If it does, then the Court looks to see if the interest was disturbed without due process. The key inquiry is whether an individual has a right or a legitimate expectation in a tangible benefit, based on the Constitution, state law or practice the revocation of which is conditioned upon the occurrence of specified events. *Vitek v. Jones,* 445 U.S. 480, 490, 100 S.Ct. 1254, 1262, 63 L.Ed.2d 552 (1980); *Durso v. Rowe,* 579 F.2d 1365, 1369 (7th Cir.1978), *cert. denied,* 439 U.S. 1121, 99 S.Ct. 1033, 59 L.Ed.2d 82 (1979). Property interests generally are not created by the Constitution. Their primary source is state law. *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Liberty interests may stem from the Constitution or state law.

If either a liberty or property interest is identified, the minimum required procedural protections are defined by federal constitutional law, not state law. *Shango v. Jurich, supra* at 1098. Not every change in the conditions of confinement having a substantial adverse impact on a prisoner invokes due process protection. *Meachum v. Fano,* 427 U.S. 215, 224, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976).

There is no constitutional right to work in prison. *Garza v. Miller,* 688 F.2d 480, 485 (7th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 796, 74 L.Ed.2d 1000 (1983); *Alitzer v. Paderick,* 569 F.2d 812–13 (4th Cir.), *cert. denied,* 435 U.S. 1009, 98 S.Ct. 1882, 56 L.Ed.2d 391 (1978). Moreover, the expectation of keeping a particular job is not a property or liberty interest entitled to due process protection. *Gibson v. McEvers,* 631 F.2d 95 (7th Cir.1980); *Bryan v. Werner,* 516 F.2d 233 (3d Cir.1975). Instead, assignments of work to prisoners is a matter of prison administration, within the discretion of prison administrators. *Alitzer v. Paderick, supra.* See also *Zemblidge v. Lane,* No. 82 C 0200, at p. 4, (N.D.Ill. June 24, 1983). Thus, where discharge from a job does not result in an increased period of confinement, no constitutional interest is impaired. *Wolff v. McDonnell, supra.*

Accordingly, any actionable right Watts may have in a prison job must be found, if at all, in state statute or policy. Watts concedes that he has no right to a *particular* job. However, he cites Ill.Rev.Stat.1979, ch. 38, §§ 1001–1–2(c), 1003–2–2(d), 1003–8–3 and 1003–12–1, along with IDOC administrative regulation ("A.R.") 802 as the sources of his right to a job.

Ill.Rev.Stat. ch. 38, § 1001–1–2 states that one of its purposes is the prevention of "arbitrary or oppressive treatment of persons adjudicated offenders and delinquents." In section 1003–2–2, a duty to "develop and maintain programs of control,

rehabilitation and employment of committed persons" is imposed on the IDOC. Such general policies "do not give rise to a protectible 'liberty interest' of entitlement." *Larson v. Mulcrone,* 575 F.Supp. 1 at 3 (N. D.Ill.1982). Likewise, sections 1003–8–3 and 1003–12–1 do not create an entitlement sufficient to invoke due process safeguards. Those sections respectively state that "work, education and other program assignments shall be made, *insofar as practicable*" and "the Department shall, *insofar as possible,* employ at useful work committed persons." (emphases added).

It is clear from the "insofar as practicable or possible" clauses that the IDOC is given discretion over job assignment decisions. If employment is impracticable or impossible, the IDOC remains in compliance with state law. Recently the Seventh Circuit stated that the exercise of such discretion "preclude[s] the implication of a liberty interest deserving of due process protection." *Shango v. Jurich, supra* at 1100.

Another Seventh Circuit decision supports the conclusion that the cited Illinois statutes do not create a protected property interest in prison employment. In *Garza v. Miller, supra,* the court held that the *federal* prison employment statute, 18 U.S.C. § 4122(b), did not create a substantive right to employment for inmates. That subsection states "[i]ts [the Federal Prison Industries] board of directors *shall* provide employment for all physically fit inmates in the United States penal and correctional institutions." (emphasis added). However, the court found that subsection 4122(a) qualifies subsection 4122(b). 18 U.S.C. § 4122(a) states:

> Federal Prison Industries shall determine in what manner and to what extent industrial operations shall be carried on in Federal penal and correctional institutions for the production of commodities for consumption in such institutions or for sale to the departments or agencies of the United States, but not for sale to the public in competition with private enterprise.

The Court held that in light of subsection 4122(a), the operation of prison industries, despite the mandatory language of subsection 4122(b), is fully within the discretion of the Federal Prison Industries Board.

Ill.Rev.Stat. ch. 38, § 1003–12–2(a) expressly provides that the operation of prison industries is fully within the discretion of the IDOC:

> The Department *may* establish, maintain and employ committed persons in industries for the production of articles, materials or supplies for resale to authorized purchasers. It *may* also employ committed persons on public works, buildings and property, the conservation of natural resources of the State, anti-pollution or environmental control projects, or for other public purposes, for the maintenance of the Department's buildings and properties and for the production of food or other necessities for its programs. (emphasis added).

Like the federal statute analyzed in *Garza v. Miller,* section 1003–12–2 qualifies section 1003–12–1 even if the latter section were stripped of its "insofar as possible" language.

Ill.Rev.Stat. ch. 38, § 1003–8–7, which sets forth disciplinary procedures, similarly does not aid Watts' argument. That section provides that certain procedures must be followed in *disciplinary* cases which may involve "[a] change in work, education or other program assignments of more than seven days duration." (emphasis added). The Seventh Circuit has said that an application of this provision to any program assignment change other than one effected as a disciplinary measure would curtail severely the ability of prison officials to exercise discretion in making program assignments. *Durso v. Rowe, supra,* at 1370. The Court concluded that because the statute does not limit the discretion of prison officials in making transfer decisions, state law does not provide a right or expectation in a program assignment. *Id.*

In the present case, Watts was not permanently removed from his job as a penalty. He was placed on "unassigned status

pending further investigation" for longer than seven days but, he was found not guilty of a rule violation subsequent to his 23 day removal. His permanent removal was consistent with a neutral policy. Under such circumstances, the actions taken cannot be characterized as "disciplinary," giving rise to specified procedures. The defendants may change Watts' work assignment permanently or temporarily to obviate the possibility of developing familiarity with staff members. In fact, the rule promulgated by Stateville's Medical Department limiting positions in the health care unit to six months duration was promulgated to address problems of interaction of inmate and noninmate staff in the Clinic. There is no evidence that the application to Watts of the six-month rotation rule was a sham and prompted by any reason other than the policy behind the rule. Even if Watts was not fraternizing with a prison employee, Stateville's authorities have a right to guard against untoward familiarity.

Watts argues that once a benefit is conferred it cannot be taken away without some form of due process. While this may be true in some situations, those situations involve substantial infringement of basic human liberties[3] or the discriminatory denial of work in prison.[4] Temporary loss of an institutional job is simply not such a situation.

Watts tries to salvage his case by arguing that his liberty interest has been impaired because he lost the opportunity to earn good time during his temporary layoff from the Clinic. That loss, in turn, allegedly extended his period of incarceration. That assertion fails to state a claim as well.[5] Illinois' good time statute, Ill.Rev.Stat. ch. 38, § 1003–6–3(a), merely authorizes the IDOC to promulgate regulations regarding the diminution in sentences for good conduct or meritorious service. See Arsberry v. Sielaff, 586 F.2d 37 (7th Cir.1978). The statute does not create a state law entitlement to earn good time. Id. Watts was not punished by subtracting statutory good time from his credit.

Furthermore, an inmate who works in the Clinic is not automatically credited with one day of good time for each day of service there. Clinic service worthy of good time credit must be specifically described as meritorious. Who can say whether Watts would have served meritoriously on any or all of the 23 days had he worked in the Clinic during those days. An interesting side note is that, unlike the Clinic, an inmate who works in the butcher shop receives one good time day for every one day worked. It is unnecessary that there be some affirmative indication that each day worked is meritorious. Theoretically, then, Watts has a better chance of gaining early release while assigned to the butcher shop than he had while assigned to the Clinic.

Neither does an administrative regulation of the IDOC create a property or liberty interest in prison employment *per se.* Watts relies on A.R. 802. In *Larson v. Mulchrone, supra,* Judge Aspen characterized A.R. 802[6] as a regulation that generally "sets forth procedures for assignment and

---

**3.** *Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 254, 63 L.Ed.2d 552 (1980) (transfer from prison to mental institution); *Gagnon v. Scarpelli,* 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973) (revocation of probation); *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (parole revocation); *Durso v. Rowe, supra* (work release).

**4.** *Bentley v. Beck,* 625 F.2d 70 (5th Cir.1980) (racial discrimination); *Sites v. McKenzie,* 423 F.Supp. 1190 (N.D.W.Va.1976) (discrimination due to mental impairment); *Glover v. Johnson,* 510 F.Supp. 1019 (E.D.Mich.1981) (different rehabilitation opportunities for female and male prisoners); *Wojtczak v. Cuyler,* 480 F.Supp. 1288 (E.D.Pa.1979) (denial of either work op-

portunity or pay to inmates in protective custody).

**5.** In any event, the plaintiff's claim for an injunction granting him good time may not be properly before the Court. Since he is asking for a reduction in the length of the time of his confinement, the sole federal remedy may be by writ of habeas corpus. *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

**6.** While it is true that *Larson v. Mulchrone* considered A.R. 802(f) specifically, Judge Aspen refers to A.R. 802 in its entirety. The full text of A.R. 802 is included as Appendix A.

reassignment of inmates to work, training and study programs." So long as such regulation also does not put limitations on the range of discretion, it does not create an entitlement sufficient to invoke due process safeguards. *Id., citing Chavis v. Rowe*, 643 F.2d 1281 (7th Cir.), *cert. denied, sub nom. Boles v. Chavis*, 454 U.S. 907, 102 S.Ct. 415, 70 L.Ed.2d 225 (1981). *See also Shango v. Jurich, supra* at 1100–01, 04. Such a restriction is not present in A.R. 802.

■ Thus, Watts has not demonstrated either a property or liberty interest protected by the Constitution or Illinois law or regulation. He is not entitled to procedural protections relative to his temporary or permanent removal from one job assignment to another.

### B. Grievance Procedure

■ Assuming *arguendo* that Watts had a right to a job, a grievance procedure is not compulsory for prisoners. *Wolfish v. Levi*, 439 F.Supp. 114, 163–64 (S.D.N.Y. 1977), *aff'd* 573 F.2d 118 (2d Cir.1978), *reversed on other grounds sub nom. Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Only deprivations from procedures which are constitutionally mandated provide a basis for a constitutional claim. *See also United States ex rel. Houston v. Warden, Stateville Correctional Center*, 635 F.2d 656 (7th Cir.1980), *cert. denied*, 454 U.S. 843, 102 S.Ct. 156, 70 L.Ed.2d 128 (1981).[7] Thus, it is totally irrelevant that some defendants may not have followed precisely the grievance procedure.

Moreover, a temporary removal for a period of 23 days creates no compensable harm. A right to work cannot mean a right to work at every moment during the period of incarceration. Watts was reinstated as a stretcher runner at the Clinic on January 27, 1982, without loss of pay. He remained in that position until April, 1982 when he was properly transferred from the Clinic

and immediately was reassigned as a butcher.

### C. Denial of Medical Care

Watts' final allegation is that he was unable to regularly obtain his eye medication at the Clinic. Watts claims that he suffered severe pain as a result. The medical records attached to Watts' first amended complaint do not indicate that Watts' condition worsened during his unassigned period, nor does he make such a claim. Watts does contend that defendant Godinez, the Assistant Warden in charge of Programs, knew or should have known that his "timely failure to act" on plaintiff's request for reinstatement would cause plaintiff loss of eye medication.

The Supreme Court has recognized that denial of medical care to an inmate that results in pain and suffering may state a cause of action under section 1983. *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), *on remand*, 554 F.2d 653 (5th Cir.1977), *cert. denied*, 434 U.S. 974, 98 S.Ct. 530, 54 L.Ed.2d 465 (1977). However, in order to state such a claim, a strict standard is imposed. Deliberate indifference to serious medical needs of prisoners must be shown. It is only the unnecessary and wanton infliction of pain that the Eighth Amendment proscribes. *Id.* 429 U.S. at 104–105, 97 S.Ct. at 291.

■ There is nothing in this record to show that the defendant was put on notice that an inmate on unassigned status necessarily obtains less adequate medical care than one who has a job assignment. Furthermore, there is no basis for the proposition that an inmate in need of constant medical care must be given a job with the health care unit. In fact, the Administrative Director of the Health Care Unit specifically requested that those with chronic medical illnesses not be assigned there. The failure to act upon a request for reinstatement in a job, absent some allegation that Godinez was told (and it was true) that

---

7. In that case, the Court held that failure to hold a hearing within 72 hours, as required by statute, did not state a valid claim, especially where the plaintiff suffered no harm from the delay. *See also Harris v. MacDonald*, 532 F.Supp. 36 (N.D.Ill.1982). In *Harris*, Judge

Shadur correctly stated that there is no independent property or liberty interest in a particular job, nor does any department regulation confer any expectation of a predeprivation hearing. *Id.* at 39, n. 4.

without reassignment to the Clinic Watts would suffer medical impairment or pain, does not suggest deliberate indifference to serious medical needs.

 In any event, Watts' allegations against Godinez are framed in terms of *respondeat superior.* A claim of constitutional injury based on a theory of vicarious liability is not actionable under section 1983. *Monell v. New York Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In order to establish the liability of a superior, rather than of a line officer, an "affirmative link" is needed between misconduct of line officers and acts of superiors. *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). Of course, if the defendant/superior officer is alleged to be directly responsible for committing the misconduct, he may be liable under section 1983. *See, e.g., Duncan v. Duckworth,* 644 F.2d 653 (7th Cir.1981); *Adam v. Pate,* 445 F.2d 105, 107 (7th Cir. 1971). Defendant Godinez, as Assistant Warden of Programs, is not alleged to be directly involved in delivery of inmate medical care or its lack thereof and no affirmative link has been described. The complaint fails to allege any overt acts on Godinez' part which contributed to Watts' alleged pain and suffering.

Taking all material, well pleaded facts as true and viewing all reasonable inferences in the light most favorable to Watts, *Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972); *City of Milwaukee v. Saxbe,* 546 F.2d 693, 704 (7th Cir.1976), Watts has failed to state a claim of constitutional magnitude against any defendant for which relief under section 1983 may be granted.

IT IS THEREFORE ORDERED that the motion to dismiss Watts' complaint is granted.

#### APPENDIX A

Illinois Department of Corrections, Adult Division Administrative Regulation 802:

Institutional Assignment Committees: (effective 8/31/76)

**I. POLICY OF DEPARTMENT:** To provide suitable work and/or study plans for residents so as to assist in their rehabilitation and eventual re-entry into the free community.

**II. EXPLANATION:**

A. The Chief Administrative Officer of each adult correctional center shall appoint one or more Assignment Committees, each of which shall be composed of at least three staff members, one of whom shall be a Program Services employee. One member of the Committee shall be designated by the Chief Administrative Officer as Chairman/Assignment Supervisor.

B. All newly-admitted residents and violators returned to institutional status shall appear before the Assignment Committee within 60 days after their admission to the institution. At that time, permanent assignments shall be made by a majority vote of the full Committee, with consideration of the recommendations made during the classification work-up.

1. A resident shall be given an opportunity to appear before and address the full Committee whenever his/her case is being considered.

2. Temporary assignments may be made by a person designated as Assignment Supervisor by the Chief Administrative Officer prior to the time the resident appears before the Committee.

3. The Assignment Supervisor may be selected from administration, security or program staffs and shall be at least in a position comparable in supervisory responsibility to a Prison Clerk III.

C. Assignment Changes:

1. After a permanent assignment has been made, a resident may, for inability or incompetence in completing a work, training or study assignment, upon the written recommendation of the staff supervisor, be removed from the assignment and reassigned by the Assignment Supervisor, with approval of the Assistant Warden of Operations or Program without convening the full Com-

mittee. However, a full Committee hearing shall be provided if requested by the resident when he/she believes such removal should receive consideration by the full Committee.

2. Permanent assignment of a resident as a result of a rule violation can only be considered after the resident is adjudged guilty in accordance with the provisions of Administrative Regulation 804 and a recommendation for assignment change is made by the Adjustment Committee or Program Team. The full Committee must make a majority determination on the change and the resident afforded the opportunity to appear before and address the Committee when his/her case is being considered.

3. Placement in segregation status under the provisions of AR 804 shall automatically remove a resident from his/her assignment. Upon release from segregation, a new assignment, by action of the Assignment Committee, shall be made in accordance with this regulation.

a. Where segregation placement is in investigation status pursuant to AR 804, II–G, which does not result in proving a violation, the resident shall be returned to the assignment held prior to being removed.

D. All staff supervisors are to keep the Committee informed as to the vacancies in their areas of responsibility, as well as the skills and abilities required for the performance of each assignment. Such notification shall be forwarded to the Committee through the Assignment Supervisor.

E. Decisions made by the Assignment Supervisor or the Assignment Committee shall be in writing, which is to include the basis for the decision. All decisions are subject to review and approval by the Chief Administrative Officer or his designate.

F. The Assignment Committee shall also be responsible for assigning, reviewing

and changing the security classification of residents, as necessary.